## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE:  THE HONORABLE JOSEPH A. LAROSKI, JR.

| | |
|---|---|
| TOPCON POSITIONING SYSTEMS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant. | Court. No. 14-00189 |

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Rules of the United States Court of International Trade,

Plaintiff, Topcon Positioning Systems, Inc., hereby moves for summary judgment in the above-

captioned action.  As set forth in the attached Memorandum in Support of Motion for Summary

Judgment, there are no genuine issues of material fact to be tried and Plaintiff is entitled to

summary judgment as a matter of law.

Myles S. Getlan
Jonathan M. Zielinski
James E. Ransdell
CASSIDY LEVY KENT (USA) LLP
900 19th Street, NW, Suite 400
Washington, DC 20006
Telephone: (202) 567-2304
mgetlan@cassidylevy.com

Angela M. Santos
Leah N. Scarpelli
ARENTFOX SCHIFF LLP
1717 K Street, NW
Washington, DC 20036
Telephone: (202) 857-6000
angela.santos@arentfox.com

*Counsel for Topcon Positioning Systems, Inc.*

Dated: November 3, 2025

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE:  THE HONORABLE JOSEPH A. LAROSKI, JR.**

| | |
|---|---|
| TOPCON POSITIONING SYSTEMS, INC., )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>UNITED STATES, )<br>)<br>Defendant. )<br>) | Court. No. 14-00189 |

**ORDER**

Upon consideration of Plaintiff's Motion for Summary Judgment, Plaintiff's

Memorandum in Support thereof, and all other papers and proceedings herein, it is hereby:

**ORDERED** that Plaintiff's Motion for Summary Judgment is **GRANTED**; and it is

further

**ORDERED** that Plaintiff is entitled to judgment that the subject rotating laser levels and

pipe lasers are properly classified under subheading 9015.30.4000, HTSUS, at a duty rate of free;

and it is further

**ORDERED** that Plaintiff is entitled to judgment that the subject parts and accessories of

Topcon's rotating laser levels and pipe lasers are classified under subheading 9015.90.0030,

HTSUS, at a duty rate of free; and it is further

**ORDERED** that Defendant reliquidate the entries covered by this action with a refund of

all duties overpaid, plus interest, as provided by law.

**SO ORDERED**.


Dated: _____                    _____
        New York, New York                                  Joseph A. Laroski, Jr., Judge

## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE:  THE HONORABLE JOSEPH A. LAROSKI, JR.

| | |
|---|---|
| TOPCON POSITIONING SYSTEMS, INC., ) | |
| ) | |
| Plaintiff, ) | Court. No. 14-00189 |
| ) | |
| v. ) | NONCONFIDENTIAL VERSION |
| ) | |
| UNITED STATES, ) | Business Confidential Information |
| ) | Removed from Brackets on Page |
| Defendant. ) | 42 and in Exhibit 1. |
| ) | |

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S
## MOTION FOR SUMMARY JUDGMENT

Myles S. Getlan
Jonathan M. Zielinski
James E. Ransdell
CASSIDY LEVY KENT (USA) LLP
900 19th Street, NW, Suite 400
Washington, DC 20006
Telephone: (202) 567-2304
mgetlan@cassidylevy.com

Angela M. Santos
Leah N. Scarpelli
ARENTFOX SCHIFF LLP
1717 K Street, NW
Washington, DC 20036
Telephone: (202) 857-6000
angela.santos@arentfox.com

*Counsel for Topcon Positioning Systems, Inc.*

Dated: November 3, 2025

## Table of Contents

Page

I.    Background ............................................................................................................... 2

II.   Subject Merchandise ............................................................................................... 3

III.  Tariff Provisions at Issue ........................................................................................ 4

IV.   Questions Presented ................................................................................................ 5

V.    Argument ................................................................................................................. 5

      A.    Jurisdiction and Standard of Review ............................................................ 5

      B.    Summary Judgment for Topcon is Warranted ............................................. 6

      C.    This Classification Dispute Is Narrowly Focused on "Surveying" ............... 7

      D.    Subject Laser Levels are Properly Classified Under Heading 9015 as Surveying
            Instruments Because Their Principal Use is "Surveying" ............................. 8

            1.    "Surveying" Under Heading 9015 Includes Measuring Elevation Relative
                  to the Earth's Surface ....................................................................... 10

                  i.     Dictionary definitions, industry publications, and Explanatory Notes
                         define "surveying" as the measurement of elevation relative to the
                         earth's surface in the field ........................................................ 11

                  ii.    "Surveying" encompasses construction surveying; CBP erred in
                         excluding surveying in construction environments ....................... 15

                         a.    Despite CBP personnel recognizing a distinction between indoor
                               alignment and outdoor measurement, CBP relied on a baseless
                               carve-out for "construction environment" activities ............. 16

                         b.    Surveying activities are not only conducted by licensed
                               surveyors .................................................................. 19

                  iii.   Explanatory Notes confirm that Heading 9015 "Surveying
                         Instruments" include laser levels intended for use in the field ......... 21

                  iv.    The French version of the HTS confirms that leveling instruments are
                         included in Heading 9015 ........................................................ 22

            2.    Subject Laser Levels' Principal Use is "Surveying" as Defined by the
                  Relevant Authorities ............................................................................ 23

i.    Subject Laser Levels are actually used for surveying ................................... 26

ii.    The trade recognizes Subject Laser Levels as surveying instruments .......... 34

iii.    The physical characteristics of Subject Laser Levels indicate they are used for surveying in the field ...................................................................... 35

iv.    Purchasers of Subject Laser Levels expect to use them for surveying in the field .......................................................................................................... 39

v.    It is not economical to use Subject Laser Levels for less sophisticated applications ................................................................................................... 41

vi.    The channels of trade and environment in which Topcon's surveying instruments are sold indicate that they are surveying instruments ............... 42

vii.    The *Carborundum* factors establish that Subject Laser Levels are "commercially fungible" with products that are primarily used for surveying, *i.e.*, measuring elevation relative to the earth's surface ............. 45

E.    CBP Misclassified the Subject Laser Levels Based upon this Court's Ruling in *Agatec*, which is Inapplicable Because it Involved a Different Type of Product and Otherwise Misconstrued the Framework for Defining "Surveying" ..................... 46

    1.    Agatec does not apply because Subject Laser Levels are high-tech levels used by surveyors in the field while the Agatec levels were basic levels used primarily for carpentry and interior projects .................................................. 47

    2.    Agatec misconstrued and narrowed the dictionary definitions that it considered, in contravention of Federal Circuit interpretive standards and prior interpretations of Heading 9015, HTSUS .................................................. 50

F.    The Remaining Articles Are "Accessories" Within the Meaning of the HTSUS ......... 51

VI.    Conclusion ............................................................................................................... 53

## <u>Table of Authorities</u>

Page(s)

<u>Statute</u>

19 U.S.C. § 1514(a) ...................................................................................................5

19 U.S.C. § 3001 .....................................................................................................22

19 U.S.C. § 3004(c)(1) ........................................................................................ 5-6, 11

28 U.S.C. § 1581(a) ..................................................................................................5

28 U.S.C. § 2636(a) ..................................................................................................5

28 U.S.C. § 2637(a) ..................................................................................................5

Heading 9015, Harmonized Tariff Schedule of the United States........................ *passim*

Heading 9031, Harmonized Tariff Schedule of the United States........................ *passim*

General Rule of Interpretation 1 ...............................................................................8

General Rule of Interpretation 3(a)...........................................................................9

Additional Rule of Interpretation 1(a) ....................................................................23

<u>Regulations</u>

19 C.F.R. § 177.11(b) ...............................................................................................3

<u>Court Decisions</u>

*Agatec Corp. v. United States*, 31 C.I.T. 847 (2007)........................................... *passim*

*Airflow Tech., Inc. v. United States*, 524 F.3d 1287 (Fed. Cir. 2008) ....................11

*Amcor Flexibles Kreuzlingen AG v. United States*, 560 F. Supp. 3d 1326 (Ct. Int'l Trade 2022) ........................................................................................................6

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242(1986) ..............................................6

*Apple Inc. v. United States*, 964 F.3d 1087 (Fed. Cir. 2020) ..............................6, 11

*Aromont USA, Inc. v. United States*, 671 F.3d 1310 (Fed. Cir. 2012) .....................24

*BASF Corp. v. United States*, 497 F.3d 1309 (Fed. Cir. 2007) .................................6

*Bausch & Lomb, Inc. v. United States*, 148 F.3d 1363 (Fed. Cir. 1998) ...............6-7

*Blue Sky the Color of Imagination, LLC v. United States*, 698 F. Supp. 3d 1243 (Ct. Int'l Trade 2024) ............................................................................... 17, 22-23

*Dependable Packaging Sols., Inc. v. United States*, 37 C.I.T. 242 (2013) ....................................24

*Dependable Packaging Sols., Inc. v. United States*, 757 F.3d 1374 (Fed. Cir. 2014) ............................................................................................8, 11, 20, 24

*Drygel, Inc. v. United States*, 541 F.3d 1129 (Fed. Cir. 2008) ....................................................11

*Franklin v. United States*, 289 F.3d 753 (Fed. Cir. 2002) ...........................................................11

*GRK Canada, Ltd. v. United States*, 761 F.3d 1354 (Fed. Cir. 2014) ..........................................14

*Heli-Support, Inc. v. United States*, 26 C.I.T. 352 (2002) ................................................... passim

*Int'l Bus. Machs. Corp. v. United States*, 152 F.3d 1332 (Fed.Cir.1998) ......................................8

*Janssen Ortho, LLC v. United States*, 995 F.3d 981 (Fed. Cir. 2021) ...........................................8

*JVC Co. of Am. v. United States*, 234 F.3d 1348 (Fed. Cir. 2000) .................................................8

*Kahrs Int'l, Inc. v. United States*, 713 F.3d 640 (Fed. Cir. 2013) ...............................................10

*Len-Ron Mfg. Co. v. United States*, 334 F.3d 1304 (Fed. Cir. 2003) ....................8, 20-21, 50-51

*Lenox Collections v. United States*, 20 C.I.T. 194 (1996) ...........................................................10

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ...................................................6, 10, 16

*Mita Copystar v. United States*, 160 F.3d 710 (Fed. Cir. 1998) ...............................................8, 10

*Park B. Smith, Ltd. v. United States*, 347 F.3d 922 (Fed. Cir. 2003)...............................................5

*Perrin v. United States*, 444 U.S. 37 (1979) ...............................................................................12

*Processed Plastics Co. v. United States*, 473 F.3d 1164 (Fed. Cir. 2006) ...................................12

*Quaker Pet Grp., LLC v. United States*, 374 F. Supp. 3d 1375 (Ct. Int'l Trade 2019)....................................................................................................................5

*Rohm & Haas Co. v. United States*, 727 F.2d 1095 (Fed. Cir. 1984) ....................................20, 51

*Rollerblade, Inc. v. United States*, 282 F.3d 1349 (Fed. Cir. 2002) .......................................... 8-9

*Rollerblade, Inc. v. United States*, 116 F. Supp. 2d 1247 (Ct. Int'l Trade 2000) .......................................................................................................................9

*Russell Stadelman & Co. v. United States*, 242 F.3d 1044 (Fed. Cir. 2001) ................... 10-11, 20

*R.W. Smith v. United States*, 41 Cust. Ct. 78 (1958)) ....................................................................16

*Salant Corp. v. United States*, 86 F. Supp. 2d 1301 (Ct. Int'l Trade 2000) .....................................7

*Schlumberger Tech. Corp. v. United States*, 845 F.3d 1158 (Fed. Cir. 2017) .............................9

*Sigvaris, Inc. v. United States*, 899 F.3d 1308 (Fed. Cir. 2018) ...................................................11

*Skidmore v. Swift & Co*., 323 U.S. 134 (1944)) ...............................................................................5

*Texas Apparel Co. v. United States*, 698 F. Supp. 932 (Ct. Int'l Trade 1988) .............................7

*United States v. Carborundum Co*., 536 F.2d 373 (C.C.P.A. 1977) ................................... *passim*

*Universal Electronics, Inc. v. United States*, 112 F.3d 488 (Fed. Cir. 1997) ...............................7

*Value Vinyls, Inc. v. United States*, 568 F.3d 1374 (Fed. Cir. 2009) ...........................................23

*Warner-Lambert Co. v. United States*, 425 F.3d 1381(Fed. Cir. 2005) .........................................5

*Well Luck Co. v. United States*, 887 F.3d 1106 (Fed. Cir. 2018) ..................................................11

*Wisconsin Cent. Ltd. v. United States*, 138 S. Ct. 2067 (2018) ...................................................11

Rules of the U.S. Court of International Trade

Rule 56(a) ...........................................................................................................................................6

Administrative Determinations

HQ H014565 (Mar. 21, 2008) ...........................................................................................................22

HQ H218087 (June 18, 2014) ................................................................................................ *passim*

HQ N018805 (Nov. 16, 2007) ...........................................................................................................22

M83375 (May 12, 2006) ....................................................................................................................28

N168565 (June 24, 2011) ..................................................................................................................28

NY J88754 (Oct. 10, 2003) ...............................................................................................................22

Other Legislative Materials

H.R. Conf. Rpt. 100-576 (1988) ...........................................................................................11, 17, 23

NONCONFIDENTIAL VERSION

<u>Other Materials</u>

World Customs Organization Explanatory Note to Heading 90.13 of the
Harmonized Tariff Schedule ................................................................................................ 19, 22

World Customs Organization Explanatory Note to Heading 90.15 of the
Harmonized Tariff Schedule ................................................................................................ *passim*

NONCONFIDENTIAL VERSION

Laser levels imported by Plaintiff Topcon Positioning Systems, Inc. ("Topcon") are surveying instruments properly classified under Subheading 9015.30 of the Harmonized Tariff Schedule of the United States ("HTSUS"), which specifically covers "levels" used for "surveying." Their accessories, in turn, are classified under HTSUS Subheading 9015.90. Standard dictionary definitions, as corroborated by industry sources (such as the textbook below), the Explanatory Notes (ENs) to the harmonized tariff convention, and expert witnesses, demonstrate that "surveying" encompasses the measurement of elevation relative to the earth's surface through leveling. Indeed, the ENs expressly place both pipe laser levels and tripod-mounted "laser" levels under Heading 9015, distinguishing the latter from simple "air bubble" levels used for indoor alignment.

# *LASER*

# *SURVEYING*

## **W.F. Price and J. Uren**



VAN NOSTRAND REINHOLD (INTERNATIONAL)

1

Topcon's laser levels are primarily used for surveying, as confirmed by each of the *Carborundum* factors. Like automatic and digital levels, which are undisputedly surveying instruments, Topcon's laser levels are deployed outdoors in large construction sites to facilitate leveling over long distances, including across large airports. Topcon's network of distributors market and thus sell these products to professional surveyors and large contractors. The only difference is that Topcon's laser levels perform the tasks faster, safer, require fewer people, and present fewer opportunities for human error. As such, Topcon's laser levels are priced at a premium, even more than automatic levels.

Internally, U.S. Customs and Border Protection ("CBP") acknowledged that "{Topcon} really ha{s} a point here," and that leveling "in an exterior location" would warrant "classif{ication} as a surveying level under 9015." Yet, CBP's administrative ruling HQ H218087 nevertheless erroneously classified Topcon's laser levels as mere measuring or checking instruments under Heading 9031. Topcon asks this Court to hold that the products at issue are properly classified under Heading 9015.

## I.    Background

Topcon, the importer of record for the entries subject to this action, is headquartered in Livermore, California and is a world leader in the development of positioning technology used in a broad range of tools and equipment for surveyors, civil engineers, construction contractors, geodists, cartographers, and governments. Since 1932, Topcon's core business has consisted of surveying instruments, including levels (automatic, digital, and laser levels), theodolites, total stations, GPS receivers, and machine control systems; all complex, finely tuned instruments for precision measurement. *See* "Plaintiff's Rule 56.3 Statement of Material Facts Not in Dispute," attached as Exhibit 1, at ¶17(e) (hereinafter "R56.3 Statement").  The Topcon products at issue

are certain models of rotating and fixed beam utility laser levels ("pipe lasers") used in outdoor surveying applications, as well as related accessories.

Topcon entered the laser levels subject to this action between September 18, 2011, and December 21, 2013 (collectively, the "Time of Entry"). *See id.* at Table 1. CBP liquidated the entries under Heading 9031, HTSUS, a residual provision covering "measuring or checking instruments…not specified or included elsewhere" in HTSUS Chapter 90. *Id.* at ¶3(c). However, Topcon's laser levels are correctly classified under Heading 9015, HTSUS, as surveying instruments. Topcon filed timely protests to that effect. *Id.* at ¶3(c); Attach.C. In parallel, Topcon also submitted a Request for Internal Advice, pursuant to 19 C.F.R. § 177.11(b). *See id.* at ¶3(b), Attach.D. CBP ultimately issued an adverse ruling on the Request for Internal Advice, *see* HQ H218087 (June 18, 2014), and thereafter denied each of Topcon's protests. Topcon tendered payment of all liquidated duties, charges, or exactions associated with each entry to CBP and timely commenced this action to challenge CBP's classification determinations.[1] *See* R56.3 Statement at ¶¶6-7.

## II.  Subject Merchandise

The surveying instruments subject to this litigation consist of various models of rotating and pipe laser levels (together collectively, "Subject Laser Levels"). All Subject Laser Levels utilize electrical components.

Rotating laser level models subject to Topcon's protests include the PZL-1A, RL-100 1S, RL-100 2S, RL-H3D TAURUS, RL-H4C, RL-VH4DR, RL-VH4G2, and RL-SV2S. *Id.* at ¶1(a)-(h). Their accessories include level sensors used to sense laser beams to determine height, or

---

[1] This action is a test case. *See* Order, ECF 30 (Oct. 22, 2021). CIT Court Nos. 14-00336, 15-00020, and 15-00021 are suspended pending final determination of this action.

with machine control systems to determine grade; field controllers to collect data; battery holders; laser beam targets; and holders that mount level sensors to the grade rod or other surface for reading. *Id.* at ¶2.

Pipe laser models that were subject to the protests at issue were part of the TP-L4 Series, including model numbers TP-L4B, TP-L4BG, TP-L4GV. *Id.* at ¶1(i)-(l). Accessories of the pipe lasers include trivet handles and legs that facilitate stable set-up, targets to capture the pipe lasers' beam, and target holders. *Id.* at ¶2(d)-(h).

Each rotating and pipe laser model listed above is ruggedized with an ingress protection ("IP") or waterproof rating; of a size and weight designed for tripod or trivet mounting; has sophisticated compensators for tilt, inclination, time, and measuring distance; and is designed to measure elevation outdoors over maximum distances of at least 200m (for pipe lasers) or 300m (for rotating lasers). *Id.* at ¶¶26-27, 29-30, 32-33.

## III. Tariff Provisions at Issue

At the Time of Entry, the HTSUS provided, in relevant part, as follows:[2]

**9015:** Surveying (including photogrammetrical surveying), hydrographic, oceanographic, hydrological, meteorological or geophysical instruments and appliances, excluding compasses; rangefinders; parts and accessories thereof:

> **9015.30:** Levels:
>
> > **9015.30.4000:** Electrical………………*Free*
>
> **9015.90:** Parts and accessories:
>
> > **9015.90.0030:** Of levels………………*Free*

---

[2] Copies of these provisions at the Time of Entry are provided in the Addendum.

**9031:** Measuring or checking instruments, appliances and machines, not specified or included elsewhere in this chapter; profile projectors; parts and accessories thereof:

> **9031.49:** Other:
>
> > **9031.49.9000:** Other………………3.5%
>
> **9031.90:** Parts and accessories:
>
> > **9031.90.5800:** Other………………3.5%

## IV.  Questions Presented

1) Does the common meaning of "surveying" encompass measuring elevation relative to the earth's surface?

2) Is the principal use of Subject Laser Levels measuring elevation relative to the earth's surface outdoors (for rotating laser levels) or underground (for pipe lasers)?

3) If so, are Subject Laser Levels "surveying" instruments or appliances classified under Heading 9015.30.4000, HTSUS?

4) If so, are accessories of Subject Laser Levels classified under Heading 9015.90.0030, HTSUS, as accessories of surveying instruments?

## V.  Argument

### A.  Jurisdiction and Standard of Review

This Court has exclusive jurisdiction of this action under 28 U.S.C. § 1581(a). Topcon timely protested the classification of the subject merchandise, which CBP denied. R56.3 Statement at ¶¶3(c), 5. In accordance with 28 U.S.C. § 2637(a), Topcon paid all liquidated duties, charges, or exactions associated with the denied protests. *Id.* at ¶6. This action was timely commenced pursuant to 19 U.S.C. § 1514(a) and 28 U.S.C. § 2636(a) by the filing of a summons on August 5, 2014, within 180 days from the date of denial of Topcon's protests. *Id.* at ¶7.

"In a tariff classification case, the court proceeds *de novo*." *Quaker Pet Grp., LLC v. United States*, 374 F. Supp. 3d 1375, 1382 (Ct. Int'l Trade 2019) (citing *Park B. Smith, Ltd. v. United States*, 347 F.3d 922, 924 (Fed. Cir. 2003)). "The HTSUS is 'considered…{a} statutory

provision{} of law for all purposes.'" *Apple Inc. v. United States*, 964 F.3d 1087, 1093 (Fed. Cir. 2020) (quoting 19 U.S.C. § 3004(c)(1)).  Consistent with controlling authority, "Customs' conclusions are not controlling upon the courts by reason of their authority and this court has an independent responsibility to decide the legal issue of the proper meaning and scope of HTSUS terms." *BASF Corp. v. United States*, 497 F.3d 1309, 1314 (Fed. Cir. 2007) (internal citations and quotation marks omitted); *see also Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024) ("such statutes, no matter how impenetrable, do—in fact, must—have a single, best meaning. That is the whole point of having written statutes…"). "The 'weight' such a ruling should receive 'in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.'" *Warner-Lambert Co. v. United States*, 425 F.3d 1381, 1384 (Fed. Cir. 2005) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

**B.  Summary Judgment for Topcon is Warranted**

Summary judgment is required when "the movant shows that there is no genuine dispute as to any material fact {such that} the movant is entitled to judgment as a matter of law." USCIT R. 56(a). "To raise a genuine issue of material fact, a party cannot rest upon mere allegations or denials and must point to sufficient evidence for the claimed factual dispute so as to require resolution at trial." *Amcor Flexibles Kreuzlingen AG v. United States*, 560 F. Supp. 3d 1326, 1331 (Ct. Int'l Trade 2022) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49 (1986).  Summary judgment in a classification action is particularly appropriate "where there is no genuine dispute as to the underlying factual issue of exactly what the merchandise is." *Bausch & Lomb, Inc. v. United States*, 148 F.3d 1363, 1365 (Fed. Cir. 1998).

The ultimate question in every tariff classification case is one of law - specifically, "whether the merchandise is properly classified under one or another classification heading." *Id.* Courts have generally applied a two-step analysis – construing the relevant tariff classification headings, which is a question of law, and determining what the merchandise is, which is a question of fact. *See id.*; *see also Universal Electronics, Inc. v. United States*, 112 F.3d 488, 491 (Fed. Cir. 1997). Where, as here, no material issue of fact regarding the merchandise characteristics is disputed, the court's only task is to construe the legal provisions at issue and compare those against the undisputed merchandise characteristics. *Id.* This resolves the ultimate legal question, *i.e.*, whether the merchandise is properly classified thereunder, such that judgment as a matter of law must be entered. *Salant Corp. v. United States*, 86 F. Supp. 2d 1301,1303 (Ct. Int'l Trade 2000); *Texas Apparel Co. v. United States*, 698 F. Supp. 932, 934 (Ct. Int'l Trade 1988), *aff'd per curiam*, 883 F.2d 66 (Fed. Cir. 1989).

As explained below, no material fact regarding Subject Laser Levels is disputed. Thus, the dispositive question presented to the Court is whether Subject Laser Levels and their accessories are classified properly as "surveying" instruments and accessories thereof, under Heading 9015, or as other "measuring or checking" instruments and accessories thereof, under Heading 9031. Because Subject Laser Levels and their accessories are properly classified under Heading 9015, summary judgment in Topcon's favor is warranted.

### C.   This Classification Dispute Is Narrowly Focused on "Surveying"

All litigants agree that Subject Laser Levels use electrical components, R56.3 Statement at ¶24, Attach.AA-2, No.4, are levels, *id.* at ¶25, Attach.AA-2, No.4, measure elevation, *id.* at ¶¶44-46, 50, Attach.AA-2, No.9, and are "instruments" or "appliances," *id.* at ¶8(c)-(d), Attach.AA-2, No.13, Attach.F, p.104-05 (*Webster's Third New International Dictionary* (1986) defining "appliance" as "(2) something applied to a purpose or use: as…(c) a tool, instrument, or

device specially designed for a particular use"); *id.*, p.1172 (defining "instrument" as "(2) utensil, implement")).

Furthermore, all litigants agree that each Subject Laser Level accessory "bear{s} a direct relationship to the {Subject Laser Level} that it accessorizes," *Rollerblade, Inc. v. United States*, 282 F.3d 1349, 1352 (Fed. Cir. 2002); R56.3 Statement at ¶¶88-93.

Given the matters agreed upon and the lack of dispute concerning Subject Laser Levels' material characteristics, the dispute presented is thus limited to whether Subject Laser Levels' characteristics suffice to qualify them as "surveying" instruments.

## D.    Subject Laser Levels are Properly Classified Under Heading 9015 as Surveying Instruments Because Their Principal Use is "Surveying"

Tariff classification of imported merchandise is governed by the hierarchical General Rules of Interpretation ("GRIs") of the HTSUS, beginning with GRI 1. *See Mita Copystar v. United States*, 160 F.3d 710, 711 (Fed. Cir. 1998). GRI 1 provides that classification is determined "according to the terms of the headings and any relative section or chapter notes." *Dependable Packaging Sols., Inc. v. United States*, 757 F.3d 1374, 1377–78 (Fed. Cir. 2014). If GRI 1 fails to classify the goods, and if the headings and legal notes do not otherwise require, the remaining GRIs may then be applied in numerical order. *JVC Co. of Am. v. United States*, 234 F.3d 1348, 1352 (Fed. Cir. 2000).

Under GRI 1, a court must construe any competing headings to determine the heading under which the merchandise at issue is classifiable.  Here, Heading 9031 is a "basket provision" that explicitly excludes instruments "specified or included elsewhere in {Chapter 90}." *See Heli-Support, Inc. v. United States*, 26 C.I.T. 352, 354 (2002) (Heading 9031 "may be invoked *only* when the item in question is not specified elsewhere in chapter 90") (emphasis supplied); *Int'l Bus. Machs. Corp. v. United States,* 152 F.3d 1332, 1338 (Fed.Cir.1998) (stating that a heading

"is a 'basket provision' as indicated by the terms 'not elsewhere specified or included.'"). Thus, the question for the court is whether the Subject Laser Levels are classifiable under Heading 9015. If so, they cannot be classified under Heading 9031.[3] *See Heli-Support*, 26 C.I.T. at 354 (noting, were it necessary to apply GRI 3(a) and classify merchandise under the more specific HTSUS Heading, "the description and requirements of heading 9015 are more specific than those of heading 9031"); *see also Rollerblade, Inc. v. United States*, 116 F. Supp. 2d 1247, 1251 (Ct. Int'l Trade 2000) ("{c}lassification of imported merchandise in a basket provision is only appropriate if there is no tariff category that covers the merchandise more specifically"), *aff'd*, 282 F.3d 1349 (Fed. Cir. 2002).

To determine whether Subject Laser Levels are classifiable under Heading 9015, the court must first construe the terms of that Heading—including "surveying"—according to their "common and commercial meanings," which are "presumed to be the same." *Len-Ron Mfg. Co. v. United States*, 334 F.3d 1304, 1309 (Fed. Cir. 2003). The common and commercial meanings of "surveying" includes measuring elevation relative to the earth's surface, *e.g.*, leveling. (**Section D.1**).

Thereafter, because Heading 9015 concerns the "use" of imported merchandise,[4] *see Agatec Corp. v. United States*, 31 C.I.T. 847, 852 (2007), the court must determine classification "in accordance with the use in the United States at, or immediately prior to, the date of importation, of goods of that class or kind to which the imported goods belong, and the

---

[3] Were Subject Laser Levels not classified under Heading 9015, then all parties agree these products are otherwise measuring or checking instruments classifiable under Heading 9031. R56.3 Statement at Attach.AA-2.

[4] *See, e.g., Schlumberger Tech. Corp. v. United States*, 845 F.3d 1158, 1164 (Fed. Cir. 2017) (distinguishing *eo nomine* (by name) and "use" classification provisions).

controlling use is the principal use," Additional U.S. Rules of Interpretation ("ARI") 1(a).

"Principal use" is that which "exceeds any other single use." *Lenox Collections v. United States*,

20 C.I.T. 194, 196 (1996) (quotation marks omitted).  (**Section D.2**).

Here, Heading 9015 includes appliances and instruments used for "surveying." As

detailed below, the common and commercial meanings of "surveying" includes measuring

elevation relative to the earth's surface, including in outdoor construction applications. (**Section

D.1**).  Next, applying the factors set forth in *United States v. Carborundum Co.*, 536 F.2d 373,

377 (C.C.P.A. 1977), to discern "principal use," Subject Laser Levels are clearly of a "class or

kind" of merchandise principally used for "surveying." (**Section D.2**)

1.  *"Surveying" Under Heading 9015 Includes Measuring Elevation Relative to the Earth's Surface*

In relevant part, Heading 9015 covers "Surveying (including photogrammetrical

surveying)…instruments and appliances." To determine whether the Subject Laser Levels are

properly classified in Heading 9015, this Court must discern the "best meaning" of the term

"surveying."  *See Loper Bright*, 603 U.S. at 400.  Neither the HTSUS nor its legislative history

define the term "surveying," and thus, the court "may rely upon its own understanding of

{surveying}, and may consult standard lexicographic and scientific authorities…" *Russell

Stadelman & Co. v. United States*, 242 F.3d 1044, 1048 (Fed. Cir. 2001) (internal citations

omitted) (quoting *Mita Copystar Am. v. United States*, 21 F.3d 1079, 1082 (Fed. Cir. 1994)); *see

also Kahrs Int'l, Inc. v. United States*, 713 F.3d 640, 644 (Fed. Cir. 2013) (the court may also

"consult…other reliable information sources").

The court "may also refer to the Explanatory Notes of a tariff subheading, which do not

constitute controlling legislative history but nonetheless are intended to clarify the scope of

HTSUS subheadings and to offer guidance in interpreting subheadings." *Russell*, 242 F.3d at

NONCONFIDENTIAL VERSION

1048 ; H.R. Conf. Rpt. 100-576 (1988) at 549 (ENs "provide a commentary on the scope of each heading of the Harmonized System and are thus useful in ascertaining the classification of merchandise under the system." They are "generally indicative of proper interpretation of the various provisions of the Convention" and "should be consulted for guidance.").[5]

Here, all relevant authorities establish that "surveying" includes the measurement of elevation relative to the earth's surface. Therefore, instruments that perform such measurements are "surveying instruments."

        i.   <u>Dictionary definitions, industry publications, and Explanatory Notes define "surveying" as the measurement of elevation relative to the earth's surface in the field</u>

When using dictionary definitions to interpret the HTSUS nomenclature, it is proper to use "the closest edition before the 1989 enactment of the HTSUS." *Airflow Tech., Inc. v. United States*, 524 F.3d 1287, 1291 n.2 (Fed. Cir. 2008) (citing "the 1986 edition of Webster's Third New International Dictionary"); *see also Well Luck Co. v. United States*, 887 F.3d 1106, 1113 n.6 (Fed. Cir. 2018) ("This definition is consistent with the definition at the time of the HTSUS's enactment"). This is consistent with treating the HTSUS as a "statutory provision{} of law for all purposes,'" *Apple Inc. v. United States*, 964 F.3d 1087, 1093 (Fed. Cir. 2020) (quoting 19 U.S.C. § 3004(c)(1)), and the "'fundamental canon of statutory construction' that words generally should be 'interpreted as taking their ordinary, contemporary, common meaning…at the time

---

[5] The framework for defining relevant HTSUS terms is essentially the same, whether a "use" provision or *eo nomine* provision is under consideration. *See, e.g.*, *Sigvaris, Inc. v. United States*, 899 F.3d 1308, 1314 (Fed. Cir. 2018); (applying dictionary definition to define "specially designed," a use provision); *Dependable Packaging*, 757 F.3d at 1379 (endorsing USCIT's dictionary-based definition of "vase," a use provision); *Drygel, Inc. v. United States*, 541 F.3d 1129, 1135 (Fed. Cir. 2008) (applying dictionary definition to define "oral perfume," a use provision); *Franklin v. United States*, 289 F.3d 753, 758 (Fed. Cir. 2002) (endorsing USCIT's dictionary-based definition of "purify," a use provision).

Congress enacted the statute,'" *Wisconsin Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2074

(2018) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)).

Applying this framework, a standard dictionary definition of "surveying" at the time of

the 1989 enactment of the HTSUS is "***the action*** or occupation ***of one that surveys***; specif: a

branch of applied mathematics that teaches ***the art of determining*** the area of any portion of the

earth's surface, the lengths and directions of the bounding lines, and ***the contour of the surface***

and of accurately delineating the whole on paper." *Webster's Third New International*

*Dictionary* (1986), p.2302 (emphases supplied) (Attach.F to R56.3 Statement; hereinafter

"*Webster's Third*").[6] "Contour" is a general term meaning the "shape" or "delimitations" of a

surface, such as the contours of a ravine. *Id.*, p.494. A surface's "contours" includes its vertical

dimensions. *See id.*

Thus, determining the contour of the earth's surface—*i.e.*, surveying—includes

determining elevation. This understanding comports with the "broad lexicographic definitions"

of "surveying" invoked by the U.S. Court of International Trade ("CIT") in prior decisions

interpreting Heading 9015. Specifically, *Heli-Support* and *Agatec* each quoted two longstanding

definitions of "surveying" that expressly encompass determining elevation. *Heli-Support*, 26

C.I.T. at 355 (quoting *Columbia Encyclopedia* (2d. Ed. 1950) (defining "surveying" as "the

science of finding the relative position on or near the earth's surface. Boundaries, areas,

***elevations***, construction lines, and geographical or artificial features ***are determined*** by the

---

[6] The CIT and CBP previously cited the definition of "survey" (not "survey*ing*") appearing in the
1981 edition of *Webster's Third*. *See Heli-Support*, 26 C.I.T. at 355-56; *Agatec*, 31 C.I.T. at 853;
HQ H218087 (June 18, 2014). However, Heading 9015 uses the term "survey*ing*." Neither *Heli-
Support* nor *Agatec* explains the apparent disconnect. HTSUS nomenclature should be
interpreted by reference to the definition of the term appearing therein (*i.e.*, "survey*ing*"), rather
than a mere cognate.

measurement of horizontal and ***vertical distances*** and angles and by computations based in part on the principles of geometry and trigonometry.") and *Encyclopedia Americana*, Vol. 26 (1953) (defining "surveying" as "the science of determining the positions of points on the earth's surface for the purpose of making therefrom a graphic representation of the area. By the term earth's surface is meant all of the earth that can be explored-the bottoms of seas and rivers, and the interior of mines, as well as the more accessible portions. It includes the measurement of distances and angles ***and the determination of elevations***.") (emphases supplied)); *Agatec*, 31 C.I.T. at 852-53 (same). The ENs to Heading 9015 further support this interpretation by including "determining ***heights*** above or below some horizontal reference level" as an example of "surveying." Heading 90.15 EN (emphasis supplied).

Industry standards likewise define "surveying" in broad terms that align with *Webster's Third*, *Columbia Encyclopedia*, *Encyclopedia Americana*, and the Heading 9015 ENs:

- "The science and art of making all essential measurements in space to ***determine the relative position of points*** and/or physical and cultural details ***above, on, or beneath the surface of the earth*** and to depict them in usable form, or to establish the position of points and/or details." *Definitions of Surveying and Associated Terms* (Am. Society of Civil Engineers ("ASCE") and Am. Cong. On Surveying and Mapping ("ACSM"), 1978), p.160 (Attach.G to R56.3 Statement; hereinafter "*Definitions*") (emphases supplied); *see also* I. Genovese, ed., *Definitions of Surveying and Associated Terms* (ACSM, 2005), p.248 (same, except deleting "in space") (Attach.H to R56.3 Statement; hereinafter "Genovese");

- "{T}he art and science of **taking field measurements on or near the surface of the Earth**." B. Kavanagh, *Surveying with Construction Applications* (2009 Ed.),[7] p.2 (Attach.I to R56.3 Statement; hereinafter "Kavanagh") (emphasis supplied).

As these open-ended industry definitions of "surveying" likewise encompass the determination of elevation, they further support the court's reliance on the common meaning of "surveying" set forth in *Webster's Third* and the Heading 9015 ENs. *See GRK Canada, Ltd. v. United States*, 761 F.3d 1354, 1360 (Fed. Cir. 2014) (finding that engineering standards "further support meanings" indicated by ENs).

Expert witness testimony agrees. Ronald Oberlander, a professionally licensed surveyor with over 30 years' surveying experience, referred to dictionary definitions described above as accurate definitions of surveying. Oberlander Expert Report, p.10-12 (Attach.P to R56.3 Statement). Likewise, the Government's expert witness did not dispute those definitions. Romano Depo., p.143-47 (Attach.R to R56.3 Statement). There is no reason to deviate from the common meaning of "surveying" as including taking measurements on or near the earth's surface, including measuring elevation.

Finally, because leveling is the primary method used to "measure{}" or "determine" elevation, R56.3 Statement at ¶¶21(e), 42-43(d), 45-46, 50, the express inclusion of "levels" under Subheading 9015.30 also underscores that a "surveying" instrument encompasses one that measures elevation. Relevant ENs also place "laser" "optical levels" and "laser" "{i}nstruments for levelling (aligning) pipes" in Heading 9015. *Id.* at Attachs.J-K. Although levels are best suited for measuring elevation and are generally incapable of performing the full complement of

---

[7] The ACSM, National Geodetic Survey, and U.S. Geological Survey supported preparation of this textbook. *See id.*, p.iv.

potential surveying measurements, levels are "surveying" instruments under Subheading 9015.30.

In short, all relevant sources for interpreting the HTSUS confirm that "surveying" includes measuring elevation relative to points on or near the earth's surface.

ii.  <u>"Surveying" encompasses construction surveying; CBP erred in excluding surveying in construction environments</u>

The broad meaning of "surveying," as defined above, encompasses many different survey types. The ASCE and ACSM explained the dynamic as follows, "{t}he list of orderly processes which can be properly termed surveys is long; it may be divided into classes according to the type of data obtained, the methods and instruments used, the purposes to be served, etc." R56.3 Statement at Attach.G, p.157. This is consistent with this Court's holding that "{s}urveying devices are broadly defined to include instruments of modern technology that carry out special types of surveying, beyond mere surface examinations." *Heli-Support*, 26 C.I.T. at 354. Specialized subcategories including subsurface surveys for oil exploration and photogrammetical surveying are considered "surveying" for purposes of Heading 9015, underscoring an intent to cast a wide net. *See id.* (citing examples of "cartridges designed to determine the dip in subsurface formations for oil exploration" and "deviation recorders and parts used to measure the angle and the direction from the vertical of an oil well hole."); Heading 9015, HTSUS ("including photogrammetical surveying"); *Janssen Ortho, LLC v. United States*, 995 F.3d 981, 991 (Fed. Cir. 2021) ("'include'…signifies a non-exhaustive list.").

Construction surveying is a common, well-established type of surveying. *See id.* (defining "construction survey"); Genovese, p.245 (same); Kavanagh, p.6, 365-67 (same). Indeed, the *Columbia Encyclopedia* definition of surveying quoted by both the CIT and the U.S. Customs Court specifically names "construction surveying" as a "branch{} of surveying." *Heli-*

15

*Support*, 26 C.I.T. at 355; *R.W. Smith v. United States*, 41 Cust. Ct. 78, 81–82 (1958)).  *Agatec*

also acknowledged that "surveying work is not excludable from the ambit of heading 9015 on

account of its being 'constructional' in nature."  31 C.I.T. at 854 n.2.

>   a.   *Despite CBP personnel recognizing a distinction between indoor*
>       *alignment and outdoor measurement, CBP relied on a baseless carve-*
>       *out for "construction environment" activities*

Contrary to the sources of statutory meaning summarized above, CBP created a baseless

distinction between measurements "in a construction environment" as non-surveying and those

using "the earth's surface as a benchmark" as surveying. *See* HQ H218087 (June 18, 2024). CBP

reasoned that Subject Laser Levels were not surveying instruments because their "principal use

is in large construction projects." *Id.* The weight of authority, including dictionary definitions

previously invoked by the CIT, confirms that "surveying" includes measurements in construction

environments; therefore, CBP's construction carve-out conflicts with the "best reading" of the

term "surveying" in the HTSUS. *See Loper Bright*, 603 U.S. at 400.

CBP relied upon the Heading 9015 EN's exclusion of "Levels (air bubble type, etc.) used

in building or constructional work (*e.g.*, by masons, carpenters or mechanics)…" to broadly

exclude equipment used for surveying construction sites from Heading 9015. *See* HQ H218087

(June 18, 2024) (citing WCO EN Heading 90.15, Attach.J to R56.3 Statement). This

interpretation cannot be correct. The chapeau to the Heading 9015 EN, which CBP failed to

acknowledge, expressly mentions "determining heights above or below some horizontal

reference level; and for all *similar measurements in constructional work (building roads, dams,*

*bridges, etc.)*…," in describing the uses of Heading 9015 instruments.  WCO EN Heading 90.15

(emphasis supplied). Considered together, these EN provisions do not exclude construction

surveying from Heading 9015. Rather, reading the ENs harmoniously establishes a mere

exclusion: small-scale indoor measurements of the type undertaken by "masons, carpenters or

mechanics" using basic levels (*e.g.*, bubble levels) are not considered surveying.[8] This interpretation is consistent with the definitions summarized above, which contemplate measurements near the earth's surface, rather than purely interior elements of a small-scale building, *e.g.*, aligning installed cabinetry, HVAC systems, or door frames.

Taken together, the relevant authorities establish that construction surveying is "surveying" within Heading 9015 because it encompasses *outdoor* surveying activities involved in the construction of structures built near the earth's surface, *e.g.*, buildings, highways, streets, pipelines, and bridges. *See* Kavanagh, p.6, 13. The Heading 90.15 EN's mention of "use in the field" further supports this assessment. WCO EN Heading 90.15. Internally, even CBP recognized that an indoor (not surveying) vs. outdoor (surveying) dichotomy was more sensible than the construction (not surveying) vs. non-construction (surveying) dichotomy that ultimately decided H218087:

> If we were not bound by the *Agatec* decision, New York thinks that a better way to distinguish surveying levels (heading 9015) from construction levels (heading 9031) is to base our classification on where the levels are principally used. If principally used in interior construction, such as for leveling a floor for installation of ceramic tile or for installing a drop ceiling or erecting interior walls, the level would be classified under heading 9031, as the levels are not principally used in surveying. ***If the laser level is principally used for grading earth, installing sewer pipes, leveling a field for installation of irrigation equipment, etc., in an exterior location, the level would be classified as a surveying level under 9015.***

R56.3 Statement at Attach.AA-1, GOV0001433 (Memorandum from Miscellaneous Products Branch Chief) (emphasis supplied).

---

[8] Although Explanatory Notes ("ENs") are not binding on this court, they are "'generally indicative of {the} proper interpretation of the various provisions' and so are persuasive evidence of the international meaning of the tariff terms.'" *Blue Sky the Color of Imagination, LLC v. United States*, 698 F. Supp. 3d 1243, 1247-48 (Ct. Int'l Trade 2024) (quoting H.R. Conf. Rpt. 100-576 (1988) at 549) ("*Blue Sky*").

As the CBP Branch Chief recognized, *see id.*, outdoor construction surveying encompasses "the action of…determining…the contour of the {earth's} surface" through a variety of measuring activities, *see Webster's Third*, p.2302, including the provision of grade, *i.e.*, elevation or slope, *see* Kavanagh, p.3, 367. For example, a common outdoor construction surveying activity is the determination of "cut-and-fill" requirements, *i.e.*, what dirt needs to be removed (cut) and what dirt needs to be moved to a particular location (fill) to establish an appropriate grade according to construction plans. *See* R56.3 Statement at ¶21(d).  Determining cut-and-fill quantities and locations is done by "leveling," *i.e.*, measuring elevation relative to the earth's surface. *Id.* at ¶21(e); *see also* Subheading 9015.30, HTSUS (covering "Levels").  In particular, "{d}ifferential leveling is used to determine differences in elevation between points (that are some distance from each other) by using a surveyor's level and a graduated measuring rod." Kavanagh, p.19.  One example of a differential leveling setup is depicted below:



**FIGURE 2.14**   Leveling procedure: more than one setup.

Source: Kavanagh, p.36; *see also* Section V.D.2.i, *infra*.

18

Similarly, because gravity flow pipelines require precise grade to function, *see* R56.3 Statement at ¶21(f), measuring and controlling the grade of underground utility pipe, *e.g.*, water pipes, gas lines, or sewers, is another key construction surveying activity, *see id.* at ¶21(g). Indeed, the ENs explicitly categorize pipe lasers as surveying instruments under Heading 9015. Specifically, the ENs to Heading 9013, which covers lasers not specified elsewhere in Chapter 90, state that Heading 9015 includes "instruments for leveling (aligning) pipes by means of a laser beam," *i.e.*, pipe lasers. In HQ H218087, CBP failed to even address the classification of pipe lasers and thus completely ignored the ENs' compelling interpretive guidance.

In sum, the term "surveying" under Heading 9015 includes the measurement of elevation relative to the earth's surface, including for construction applications. Elevation measurement is achieved through "leveling," using tools such as the Subject Laser Levels. In contrast, basic levels akin to air bubble type are generally used in indoor applications and would be covered by Heading 9031.

### b. *Surveying activities are not only conducted by licensed surveyors*

A single expert witness, retained by the Government, would rewrite *Webster's Third* and the ASCE and ACSM definitions to restrict "surveying" to activities performed by professionally licensed individuals. As stated by Mr. Romano: "I put surveying in the bucket of…what you're licensed for," Romano Depo., p.40, so "in the hands of a licensed surveyor doing licensed surveying activities, a rotating laser could be considered a survey tool. In the hands of a non-licensed surveyor or -- and producing a non-licensed survey activity, I don't think it's a survey tool." *Id.*, p.160. This narrow view contradicts common understandings of "surveying" and this court's interpretation of that term. It fails to satisfy the standards for altering the meaning of "surveying" for purposes of Heading 9015.

Courts generally disfavor reliance on expert opinions to interpret HTSUS nomenclature unless specific conditions are met, *i.e.*, the existence of a substantial "type and scope of ambiguity" in the "{ordinary dictionary} definition." *See Len-Ron*, 334 F.3d at 1310 (rejecting appellant's argument that reliance on exports was warranted to narrow dictionary definition of "vanity case"). Even when these conditions are triggered, the bar is high: "One who argues that a term in the tariff laws should not be given its common or dictionary meaning must prove that there is a different commercial meaning in existence which is definite, uniform, and general throughout the trade." *Id.* (quoting *Rohm & Haas Co. v. United States*, 727 F.2d 1095, 1097 (Fed. Cir. 1984)).

Mr. Romano's interpretation finds no support in "standard lexicographic and scientific authorities" that define the general term "surveying." *Russell Stadelman*, 242 F.3d at 1048. Indeed, this Court has expressly rejected the argument that an article "is not a surveying instrument because it is not an instrument used in the practice and science of surveying by a surveyor." *Heli-Support*, 26 C.I.T. at 356 (device that records topographical images from a helicopter or aircraft is a surveying device). And, dispositively, the Government's expert witness acknowledged that his definition of "surveying" was out of step with common and industry usage of the term. *See, e.g.*, Romano Depo., p.114 (acknowledging that "construction surveyor" is "very common" but the expert's preferred term "construction measurer" is "not very common"). Indeed, none of the other industry witnesses deposed defined surveying in similarly narrow terms. *See*, *e.g.*, R56.3 Statement at ¶¶18(a), 20. The Federal Circuit has cited similar statements as a basis for disregarding testimony that does not "connot{e} any broad commercial meaning or industry practice." *Dependable Packaging*, 757 F.3d at 1379-80 (quoting admission

that "utility vase" is not "a term of art" or "used in the industry" to denote a particular product type).

In sum, the Government's expert has not proffered an alternative definition that is "definite, uniform, and general throughout the trade." *Len-Ron*, 334 F.3d at 1310. Thus, the standard dictionary definition of surveying as "determining…the contour of the {earth's} surface," *Webster's Third*, p.2302, which encompasses the measurement of elevation relative to the surface of the earth, including in large-scale construction projects, continues to be the "best meaning" of "surveying" in Heading 9015. This definition does not limit "surveying" to the activities of professionally licensed individuals.

    iii.   Explanatory Notes confirm that Heading 9015 "Surveying Instruments" include laser levels intended for use in the field

The Heading 90.15 ENs explicitly include laser levels intended for use in the field, such as Subject Laser Levels, under Heading 9015. As mentioned, Heading 9015 includes a specific subheading (9015.30) for "levels." The Heading 90.15 ENs provide for "laser" levels, characterizing "surveying" instruments as "Optical levels (. . . *laser*, etc.) generally used mounted on a tripod" and "generally intended for use in the field." (emphasis supplied). This description captures Subject *Laser* Levels, which are built for use on a tripod (in the case of rotating lasers), trivet (in the case of pipe lasers), and otherwise ruggedized for outdoor, in-the-dirt application (in the case of both rotating and pipe lasers). *See* R56.3 Statement at ¶¶26, 27, 29.

By contrast, notwithstanding the "Levels" subheading (9015.30), the Heading 90.15 ENs exclude "air bubble type" levels used for alignment work in small-scale building or constructional work by "masons, carpenters, or mechanics." CBP's erroneous construction/non-construction dichotomy overlooked the Heading 90.15 ENs' more relevant juxtaposition—

including tripod-mounted laser levels for use in the field while excluding indoor air bubble levels. *See* HQ H218087 (June 18, 2014). Unlike Subject Laser Levels, the excluded levels are tools used for alignment, not for "determining…the contour of the {earth's} surface." *Webster's Third*, p.2302.

CBP's classification of other non-surveying tools under Heading 9031 reflects this indoor/outdoor distinction. For example, self-leveling laser alignment tools designed for handheld use that emit a visible beam were found to be for interior use, not surveying. *See* HQ H014565 (Mar. 21, 2008). A level intended for use by "do-it-yourselfers in hanging a picture" or interior assembly and maintenance was likewise found not to constitute a surveying instrument. *See* HQ N018805 (Nov. 16, 2007). Finally, a handheld combination laser level and stud finder was also found not to be surveying equipment. *See* NY J88754 (Oct. 10, 2003). The small-scale, interior applications of these products contrast with Subject Laser Levels, which are tripod- or trivet-mounted levels generally used in the field. Heading 90.13 ENs and Heading 90.15 ENs expressly indicate that such products are covered by Heading 9015.

    iv.   <u>The French version of the HTS confirms that leveling instruments are included in Heading 9015</u>

The French text of Heading 9015 explicitly includes the term "*nivellement*," which means "leveling" and further supports including Subject Laser Levels within Heading 9015. The court's "obligation…in interpreting the HTSUS, is to ensure that U.S. law reflects 'the nomenclature established internationally by the Convention,' *see* 19 U.S.C. § 3001, unless altered by Congress." *Blue Sky*, 698 F. Supp. 3d at 1255. Thus, courts have considered the French text of the International Convention on the Harmonized Commodity Description and Coding System (the "Convention"), which was the foundation of the HTSUS. *Id.* "{T}he French and English texts are considered equally authoritative treaty texts" and if both can be read to

agree, that interpretation should prevail.  *Id*. at 1247-1249; *see also Value Vinyls, Inc. v. United States*, 568 F.3d 1374, 1378 (Fed. Cir. 2009) ("The 'harmonization' of the tariff schedule was designed generally to adopt internationally accepted product nomenclature…"); H.R. Conf. Rpt. 100-576 (1988) at 547 ("The Senate amendment makes Congressional findings that establishment of a uniform international tariff classification system will be of significant U.S. benefit...").

Here, a distinction between the French and English Convention texts of Heading 9015 bears directly upon the classification question presented. In English, Heading 9015 encompasses "surveying" instruments. Dictionary definitions and other sources referenced in Section V.1.i, *supra*, demonstrate that "surveying" includes measuring elevation and leveling.  The French version of Heading 9015 further confirms this, as it mentions not only "*arpentage*" (surveying) but also "*nivellement*" (leveling). R56.3 Statement at ¶17(a)-(c). Topcon's French website also uses the term *nivellement*, characterizing rotating lasers as a "*solution idéale pour…nivellement*" (ideal solution for grading) as well as "*arpentage de chantier*" (site surveying).  *Id.* at Attach.O.

There is no indication that Congress intended to change the Convention meaning. Thus, the English and French texts should be read to agree that "surveying" instruments covered by Heading 9015 include instruments used for leveling, like Subject Laser Levels.

    2.    *Subject Laser Levels' Principal Use is "Surveying" as Defined by the Relevant Authorities*

When considering classification under a principle use provision, the court must determine whether the use described by the HTSUS accords "with the use in the United States at, or immediately prior to, the date of importation, of goods of that class or kind to which the imported goods belong…" ARI 1(a). Principal use provisions "'call for a determination as to the group of goods that are commercially fungible with the imported goods" to identify the "use

'which exceeds any other single use.'" *Dependable Packaging*, 757 F.3d at 1377–78 (*citing*

*Aromont USA, Inc. v. United States*, 671 F.3d 1310, 1312 (Fed. Cir. 2012)).  Here, the court must

decide whether Subject Laser Levels are commercially fungible with a class or kind of goods

that are principally used for "surveying," as defined above.

> Courts rely on the following factors to assess commercial fungibility:

> > {The} use in the same manner as merchandise which defines the class; the general physical characteristics of the merchandise; the economic practicality of so using the import; the expectation of the ultimate purchasers; the channels of trade in which the merchandise moves; the environment of the sale, such as accompanying accessories and the manner in which the merchandise is advertised and displayed; and the recognition in the trade of this use.

*Dependable Packaging*, 757 F.3d at 1380 (citing *Carborundum*, 536 F.2d at 377).  The weight

accorded to each factor depends on the facts presented, but no single factor is dispositive.  *See*

*Aromont*, 671 F.3d at 1316 (finding "a strong showing with respect to" three factors and viewing

the factors "in its totality"); *Dependable Packaging Sols., Inc. v. United States*, 37 C.I.T. 242,

252 (2013), *aff'd*, 757 F.3d 1374 (Fed. Cir. 2014) (reducing weight accorded to certain factors

given strength of others).

> Below, Topcon defines the "class or kind" of goods to which Subject Laser Levels

belong, a step that CBP omitted in HQ H218087:

- Subject rotating laser levels are commercially fungible with ruggedized, tripod-mounted optical levels used with a surveyor's rod and/or machine control accessories to measure elevation outdoors over distances up to 600m or more, including laser levels, digital levels, and automatic levels.

- Subject pipe laser levels are commercially fungible with ruggedized fixed beam lasers used to maintain grade in outdoor pipelaying over distances up to 200m or more.

Each *Carborundum* factor supports the conclusion that, at the Time of Entry, the principal use of the class or kind of merchandise to which Subject Laser Levels belong was "surveying" within the meaning of Heading 9015.

*First*, Subject Laser Levels are actually used in surveying and the trade recognizes their utility for such applications. Professionals (whether licensed or not) use Subject Laser Levels to measure elevation relative to the surface of the earth, including through differential leveling, machine control, grade control, and pipelaying, because these instruments offer far greater efficiency and comparable accuracy, when compared to traditional surveying instruments. (**Subsections V.D.2.i-ii**).

*Second*, Subject Laser Levels' physical characteristics, including patented design features and integrated compensators for tilt, inclination angle, time, and measuring distance, are tailored for taking elevation measurements in outdoor worksites over long distances. (**Subsection V.D.2.iii**).

*Third*, Subject Laser Levels' major purchasers are sophisticated construction professionals: outdoor construction contractors, surveyors, and engineering firms. These entities purchase Subject Laser Levels expecting to measure elevation in the field on large-scale construction projects and rely on certified technicians for interim service over the 10-to-15-year lifespan of each machine. (**Subsection V.D.2.iv**).

*Fourth*, given the operational benefits and technical capabilities, Subject Laser Levels are priced at a premium. It would not be economical to devote these instruments to less-demanding applications, *e.g.*, indoor alignment work. (**Subsection V.D.2.v**).

*Fifth*, the channels and environment in which Subject Laser Levels are sold further support their principal use as surveying instruments. Topcon's network of distributors market

and sell these products specifically and directly to professional surveyors and large contractors to meet the demands of large-scale construction and earthwork. (**Subsection V.D.2.vi**).

With respect to each of these factors, the evidence confirms that each of the Subject Laser Levels shares many characteristics with other levels that CBP considers to be surveying instruments, while at the same time being distinct from levels used primarily in interior applications that CBP has classified under Heading 9031.[9]

i.    Subject Laser Levels are actually used for surveying

*Laser Surveying*, a 1989 textbook, quite clearly confirms laser levels' use for surveying activities, and more recent images depicted below also show that laser levels have long been used for surveying, *i.e.*, to measure elevation relative to the earth's surface.

---

[9] With respect to the products analyzed by *Agatec* in particular, Topcon separately details the distinctions between these products and Subject Laser Levels in Section V.E.1, *infra*.











Source: R56.3 Statement at Attach.AL (emphasis supplied).

Each Subject Laser Level can be grouped into one of two types: rotating laser levels and pipe laser levels. Among rotating laser levels, all measure elevation on horizontal planes and two subtypes have additional capabilities: slope lasers and positioning zone lasers ("PZLs"). Slope lasers are rotating laser levels that can measure on sloped planes, in addition to horizontal planes. *Id.* at ¶56. PZLs, in turn, are a specialized type of rotating laser capable of measuring a wide "zone," rather than a flat plane. *Id.* at ¶¶38(k), 64(a).

*Rotating laser levels*. Rotating laser levels are a subset of a broader category of optical levels designed to measure elevation relative to the earth's surface through differential leveling. Differential leveling involves an optical surveying device (*e.g.*, a rotating laser level) and

27

surveyor's rods. CBP has repeatedly recognized that surveyor's rods are surveying instruments classified under Heading 9015, HTSUS. *See, e.g.*, N168565 (June 24, 2011); M83375 (May 12, 2006). Indeed, *all* optical levels—whether laser, automatic, or digital—require a surveyor's rod to measure elevation.[10] R56.3 Statement at ¶44. Relevant here, as depicted below, the surveyor's rods are used in conjunction with a tripod-mounted rotating laser level to measure the elevation at two or more points and compute the difference—hence the name "<u>differential</u>" leveling. Differential leveling measurements can be used for various purposes, *e.g.*, placing grade stakes to mark "cut and fill" targets. *See id.* at ¶54.



Source: *Id.* at Attach.I, p.35.

The optical surveying device used to perform differential leveling can vary. *Id.* at ¶44. Other than rotating laser levels, the task can be performed by digital levels or automatic levels. *Id.* at ¶42. Subheading 9015.30 specifically covers "levels" that are surveying instruments. Thus, CBP has recognized that using digital levels for differential leveling supported their status as surveying instruments. *See id.* at ¶43, Attach.AA-1, GOV0001939, GOV0002450 (classifying digital levels

---

[10] With automatic levels, the person standing at the level reads the rod. With digital levels, the person standing at the level scans the rod. With rotating laser levels, the person standing at the rod first uses the sensor to find the correct height and then reads the rod.

under 9015.30.4000). The International Organization for Standardization ("ISO") recognizes both digital levels and rotating laser levels as surveying instruments. *See id.* at Attach.W (field procedures for testing surveying instruments).

From a practical perspective, the only difference in how laser, automatic, or digital levels perform differential leveling is that automatic and digital levels require two persons to perform the task (one at the rod, and one at the level), whereas rotating laser levels require only one person (at the rod). *Id.* at ¶46. Rotating laser levels' advantage is due to the inclusion of a remote sensor that gets affixed to the surveyor's rod and acts as the surveyor's "eyes" to "read" the laser being projected from the rotating laser level. *See id.* at ¶92 (*e.g.*, Level Sensors LS-B10W, LS-80G/PS, and LS-80L/PS, accessories in this action). Indeed, a single person with a sensor on a surveyor's rod can walk around a large construction site and take measurements at many different locations without ever needing to adjust the rotating laser level. *Id.* at ¶47. These productivity gains can be multiplied if multiple people have a surveyor's rod with sensors, in which case each rod can simultaneously be used to take readings at different locations within range of one rotating laser level. *See id.* at ¶48. By contrast, verbal communication between the "rod man" and the "level man" is required to take a single reading with an automatic or digital level, and unlike the sustained 360-degree signal of the rotating laser level, automatic and digital levels are constrained to measure in one direction at a time. *See id.* at ¶46. This is slower and increases the potential for user error in communicating locations or measurements. *See id.* at ¶49.

Industry publications and several deponents extoll the cost savings and efficiency gains associated with rotating laser levels in differential leveling surveying applications.

- Rotating laser levels are credited with "a 50-percent increase in work accomplished along with a 50-percent decrease in work force" in the *Surveying with Construction Applications* textbook. *Id.* at Attach.I, p.544.

- Laser methods of vertical control are characterized as "(i) convenient, (ii) quick, and (iii) accurate" in the "Construction Surveying" chapter of the *Fundamentals of Surveying* textbook. *Id.* at Attach.X, p.538.

- "One distinct advantage of laser levels is that they can be operated by a single person. The laser level is mounted on a tripod and leveled. Once turned on, the laser does not require any supervision. The surveyor can walk around the area and record rod readings anywhere within the range of the beam." *Id.* at Attach.AP, p.28.

- "{Y}ou only need one man who has this electronic device that receives the signal that tells me the elevation. Essentially, they do the same thing. It's just one is more efficient than the other." Cleary Depo., p.10 (Attach.AN to R56.3 Statement). "There have been some surveyors who have come in {to my store} and {said} just let me take the laser because they don't have another guy. They can't afford it. It's just them." *Id.*, p.38-39.

Many large-scale construction projects require such surveying, *e.g.*, highways, high-rise buildings, bridges, dams, piers, railroads, athletic fields, and airports. R56.3 Statement at ¶55. Thus, these products appear in manuals published by governmental departments that oversee such projects. The U.S. National Engineering Manual addresses equipment maintenance standards via state supplements, several of which specifically include "laser levels" among "survey{ing}" equipment. *See id.* at Attach.AZ (supplements for Illinois, Iowa, and New York). Rotating laser levels can also be used for land surveys. *See id.* at Attach.AZ. Indeed, the U.S. Patent and Trademark Office ("USPTO") has consistently labeled mechanisms designed and

patented by Topcon and incorporated into rotating laser levels as used for "surveying" applications. *Id.* at Attach.BB.

Machine guidance and control is another primary surveying usage common to all rotating laser levels. *Id.* at ¶60. In essence, machine guidance and control is a form of real-time, automated differential leveling, enabled by communication between the rotating laser level and a machine-mounted sensor. *See id.* at ¶62. "Large tracts (*e.g.*, airports, shopping centers, parking lots) are brought to grade through the use of rotating lasers and machine-mounted laser detectors, which convey to the operator of the machine (bulldozer, grader, or scraper) the up/down operations required to bring that part of the project to the designed grade elevation." *Id.* at ¶61, Attachs.I, U, V, AM, AN, AS, AT. The basic function is the same for all rotating laser levels at issue here, although slope laser levels are especially versatile given their ability to project a flat plane at a specified incline. *Id.* at ¶56. PZLs increase functionality even further by (A) significantly expanding the range of vertical control, up to 10 meters with one PZL or 40 meters with four linked PZLs, *id.* at ¶64(b), and (B) the ability to interface with GPS systems, *id.* at ¶64(b). Before laser machine guidance and control, surveying personnel were required to manually stake worksites ("hubbing the slope"), connect grade stakes with a physical string to denote slope, and draw fill lines for grading operations, all time- and personnel-intensive processes. *See id.* at ¶63.

Laser machine control applications enabled by rotating laser levels likewise facilitate the safe, accurate and efficient measurement of elevation. As summarized in the *Surveying with Construction Applications* textbook:

> Recent advances in machine guidance and machine control have resulted in layout techniques that significantly improve the efficiency of the stakeout (by as much as 30 percent according to some reports). Also, by reducing the need for as many stakeouts and thus the need for as many layout surveyors and grade checkers

> working near the moving equipment, these techniques provide a significant improvement in personnel safety....The major impetus for the development and acceptance of guidance and control techniques in construction surveying has been the increase in efficiency of the operation, with a resulting reduction in costs. By reducing continual and repetitive human operations and computations, these techniques also reduce the chances for costly errors and mistakes.

R56.3 Statement at Attach.I, p.24; *see also id.* at Attach.AL, p.160 (summarizing the "considerable number of advantages to be gained by using lasers to control earthmoving and grading machinery"). *Professional Surveyor Magazine* similarly describes rotating laser level machine control as "virtually eliminat{ing} the need for staking and mak{ing} operating equipment easier" and thereby "speed{ing} project completion {and} avoid{ing} wasted effort and misuse of resources," *id.* at Attach.U, p.1-2, as well as "returning unprecedented levels of productivity, accuracy, and control" with "dramatically reduced" labor costs and jobs finished "ahead of schedule," *id.* at ¶65(d), Attach.AT, p.1.

   ***Pipe laser levels***. These products are specialized for surveying applications associated with pipelaying and pipe inspecting (*e.g.*, sewers, water pipelines, and fuel pipelines). *Id.* at ¶68, Attach.I, p.13; Kerwin Depo. (Attach.S to R56.3 Statement), p.165; Gilbertson Depo. (Attach.V to R56.3 Statement), p.20. As shown in the figures below, pipe laser levels' specialized shape allows them to be placed inside of the pipe. With the aid of a target, pipe lasers are set at a grade that aligns along a pipe's center line, thus ensuring that the pipeline maintains the desired elevation and percent of grade relative to the earth.



Fig. 18.6  Laser beam inside pipeline.

*Source*: *Id.* at Attach.X, p.542.



*Source*: *Id.* at Attach.Z, p.4-7.

Pipe laser levels are especially important because "{s}lopes must be very carefully maintained in

gravity flow lines because it utilizes only the force of gravity for maintaining flow." *Id.* at ¶69,

Attach.X, p.539.  These products take the place of traditional methods using sight rails and

boning rods. *Id.* at ¶68, Attach.X, p.539-41; Attach.AL, p.78. Like rotating laser levels, the use

of pipe laser levels offers several advantages over traditional methods, for example: "(i) Less

labor is required; (ii) Line and grade can be accurately staked; (iii) On going work can be easily

checked; and (iv) Trench can be back filled as soon as the pipe is installed." *Id.* at ¶70(a),

Attach.X, p.541. Thus, the Heading 90.13 EN confirms that lasers used in pipelaying are

surveying instruments classified in Heading 9015. And as with rotating laser levels, the mechanisms designed and patented by Topcon and incorporated into pipe laser levels have consistently been characterized as used for "surveying" applications by the USPTO. *Id.* at ¶71. As one Topcon distributor stated, "from our experience, the rotating lasers and the pipe lasers are generally 'in-dirt' applications. So they're out before the building exists, doing the land leveling, shaping, or putting in pipe." Gilbertson Depo., p.50.

In sum, Subject Laser Levels are most often used for the same purposes as other instruments that are part of the same class or kind of goods, such as automatic and digital levels, classifiable as surveying levels under subheading 9015.30. The outdoor, in-the-dirt elevation-measuring activities of Subject Laser Levels are distinct from the mainly indoor, small-scale construction uses to which masons, carpenters, or mechanics put "air bubble type" levels and other devices classified in Heading 9031.

ii.    The trade recognizes Subject Laser Levels as surveying instruments

As explained above, professionals use Subject Laser Levels to measure elevation relative to the earth's surface in constructional environments. Indeed, all distributors and experts deposed over the course of this action recognized Subject Laser Levels as instruments suited to that purpose. *See* Beathard Depo., p.22-23(Attach.AM to R56.3 Statement); Cleary Depo., p.10-11, 74; Gilbertson Depo., p.24-28; Romano Depo, p.45, 80, 93-94; Oberlander Expert Report, p.8-9, 11; Kerwin Depo, p.62-63. Some persons engaged to perform these tasks, *i.e.*, take the measurements, are professionally licensed surveyors ("PLS"), but many are not. *See* Cleary Depo., p.48-49. Nevertheless, the lack (or possession) of licensure by the individual does not make the activity "surveying." *See* Section V.D.ii.b, *supra* (addressing the absence of a licensure requirement in the definition). Thus, the actual use of Subject Laser Levels reflects the trade's recognition of Subject Laser Levels' surveying role.

iii.   <u>The physical characteristics of Subject Laser Levels indicate they are used for surveying in the field</u>

Subject Laser Levels' physical characteristics reflect the large-scale, "in-dirt" surveying measurement applications to which they are dedicated. As shown in the tables below, all Subject Laser Levels are capable of measuring long distances (ranging from 200m to 800m maximum) for long periods of time (ranging from 20-hour to 120-hour maximum), built to withstand harsh environmental conditions (ranging from IP54 rating to fully waterproof), designed to be mounted on a tripod (for rotating lasers) or trivet (for pipe lasers), and heavy enough to remain firmly in place and withstand environmental shocks. R56.3 Statement at ¶¶33, 35, 26, 27, 29.

**Table 1: Rotating Laser Level Physical Specifications**

| Rotating Laser Model No. | Range (Diameter) | Environmental Rating | Weight | Tripod Mounted? | Continuous Operating Time | Slope Laser? |
|---|---|---|---|---|---|---|
| PZL-1A | 600m | IPX6 | 2.9kg+ | Yes | 20hrs | PZL |
| RL-100 1S | 800m | IP66 | 3.4kg | Yes | 85hrs | Yes |
| RL-100 2S | 800m | IP66 | 3.6kg | Yes | 85hrs | Yes |
| RL-H3D TAURUS | 300m | IP56 | 2.0kg | Yes | 60hrs | No |
| RL-H4C | 800m | IP66 | 2.6kg | Yes | 100hrs | Yes |
| RL-VH4DR | 300m | IP54 | 2.2kg | Yes | 90hrs | No |
| RL-VH4G2 | 300m | IP54 | 2.6kg | Yes | 30hrs | No |
| RL-SV2S | 800m | IP66 | 2.7kg | Yes | 120hrs | Yes |
| Comparison Surveying Levels | | | | | | |
| Automatic Level Topcon AT-B | 32X Magnification | IP-X6 | 1.7kg+ | Yes | No Limit | N/A |
| Digital Level Topcon DL-502 | 100m (One Direction) | IP-X4 | 2.4kg | Yes | 16hrs | N/A |

Source: *Id.* at ¶¶26-28, 30-31, 33-36.

**Table 2: Pipe Laser Level Physical Specifications[11]**

| Pipe Laser Model No. | Range (Remote Control) | Construction | Weight | Trivet Mounted? | Continuous Operating Time |
|---|---|---|---|---|---|
| TP-L4B | 200m+ | Cast Aluminum, Waterproof at 5m for 24 hours | 3.8kg | Yes | 70hrs |
| TP-L4BG | 200m+ | Cast Aluminum, Waterproof at 5m for 24 hours | 3.8kg | Yes | 45hrs |
| TP-L4GV | 200m+ | Cast Aluminum, Waterproof at 5m for 24 hours | 3.8kg | Yes | 45hrs |

Source: *Id.* at ¶¶26, 29-30, 32, 35.

The intention behind these design elements is to "manufacture lasers that are rugged, that will hold up to the elements that our professional engineers and surveyors and contractors will want to purchase." Kerwin Depo., p.225. Given the ruggedized construction, Subject Laser Levels can remain in operation for "10 or 15 years." *Id.*, p.210. The environmental ratings are comparable to or better than automatic levels (IP-X6) and digital levels (IP-X4).[12] R56.3 Statement at ¶26.

To provide a sense of the scale at which these products may be used, an 800-meter range is enough to cover "a large airport" with just one machine. Kerwin Depo., p.116. CBP incorrectly suggested that subject rotating laser levels operate at a scale similar to the *Agatec* laser levels, *see* HQ H218087 (June 18, 2024) ("Topcon's…merchandise is used primarily in large construction projects, as was true in Agatec."), when in fact Topcon's rotating laser levels are suited for projects more than twice as large, *compare* Table 1 (describing ranges of 600-

---

[11] Pipe laser levels are not rated for a specific maximum range. The laser may project beyond 200m; however, the standard remote control included to facilitate remote adjustment and alignment is rated for up to 200m.

[12] In interpreting ingress protection ("IP") ratings, the first numerical digit addresses resistance to solid foreign objects (*e.g.*, dust) and the second numerical digit addresses water resistance. Higher numbers indicate greater resistance. An "X" indicates no rating.

800m), *with Agatec*, 31 C.I.T. at 847 (maximum range of 300m). Relative to rotating laser levels, pipe laser levels have a shorter range that reflects their specialized use in measuring grade and elevation in the context of laying and inspecting underground pipelines. Even still, pipe laser levels have a *longer* range (200m) than digital levels (100m), R56.3 Statement at ¶¶32, 34, and CBP found the latter to be surveying instruments, *see* QUICS 25592 at GOV0001939, GOV0002450 (classifying digital levels under 9015.30.4000). The ability to remotely control pipe laser levels from over two football field lengths' away underscores pipe laser levels' use in large-scale projects.

CBP misunderstood three other key physical characteristics of rotating laser levels. *First*, CBP asserted that subject rotating laser levels were "used to measure horizontal and vertical planes to determine straight lines." HQ H218087 (June 18, 2014). CBP's meaning is unclear, particularly the reference to "vertical planes," but appears to suggest that rotating laser levels do not measure elevation because they project in a flat plane. Yet, this is also the case with automatic and digital levels, which likewise take their measurements in a "horizontal…plane" to measure elevation by reading the surveyor's rod. *See* Cleary Depo., p.39; Gilbertson Depo., p.39-40; R56.3 Statement at Attach.D, p.10-11, 17-18 (describing operations of automatic and digital levels). Put differently, for all optical levels, the surveyor's rod will move along the vertical axis while the level maintains a constant plane, hence the name "level." Rotating laser levels are not distinctive in this respect, and therefore no less "surveying" instruments than digital or automatic levels.

*Second*, CBP incorrectly asserted that rotating laser levels "measure in one direction" and treated this as support for "preclud{ing} classification as surveying instruments of Heading 9015, HTSUS." HQ H218087 (June 18, 2014). As noted above, rotating laser levels

simultaneously measure in *all* directions on a given plane, *i.e.*, 360 degrees. R56.3 Statement at ¶47. Indeed, in this respect, rotating laser levels measure in *more* directions than automatic or digital levels, which each require the "level man" to manually orient the device in the direction of the "rod man." *See id.* at ¶46.

*Third*, CBP characterized rotating laser levels as limited to measuring "horizontal and vertical planes" and doing so "without resort to geometric or trigonometric principles." HQ H218087 (June 18, 2014). Yet, all Subject Laser Levels may be used by construction personnel for trigonometric calculations, as with data gathered using other surveying instruments, and slope levels (Model Nos. RL-100 1S, RL-100 2S, RL-H4C, RL-SV2S) incorporate internal computers that rely on trigonometric principles to measure sloped planes. R56.3 Statement at ¶9.

Moreover, other features unacknowledged by CBP establish that subject rotating laser levels are used principally for surveying applications. This includes inbuilt compensating devices for tilt, inclination angle, time, and measuring distance. *Id.* at ¶38(p). The "height alert" is a common function incorporated into rotating laser levels that reinforces its outdoor applications. *Id.* at ¶37. This feature addresses a practical issue. A single person may take measurements while standing hundreds of meters away from the rotating laser level. On a busy outdoor jobsite, the rotating laser level may be hit or otherwise displaced without the person having seen. "Height alert" provides remote notification of any such displacement, so that they can re-check the position of the rotating laser level and ensure accuracy.[13] To further enhance this function, the RL-100 1S and RL-100 2S models have additional sensors to detect vibrations. *Id.* at ¶37(a).

---

[13] This feature is not common to pipe laser levels, as the underground, inside-the-pipe environment in which they are typically deployed is far less prone to accidental displacement.

Finally, Topcon's U.S. patents further establish USPTO recognition that Subject Laser Levels' physical characteristics are surveying-oriented. Topcon's patents characterize Topcon's laser levels as, *e.g.*, a "laser surveying instrument," "rotary laser survey equipment," "laser beam survey instrument," "surveying instrument," or "surveying system." *Id.* at ¶¶38, 71. The features detailed in Topcon's patents confirm Subject Laser Levels' surveying function, including simultaneous projection of lasers on multiple planes, *e.g.*, *id.* at Attach.BB-2, p.1, automatic self-leveling after being set up on uneven terrain, *e.g.*, *id.* at Attach.BB-4, p.3-4, preventing water and dust intrusion, *id.* at Attach.BB-8, p.2, improving measuring and/or detection accuracy over long distances, *e.g.*, *id.* at Attach.BB-24, p.3, controlling multiple construction machines at once, *id.* at Attach.BB-1, p.3-4, and improving operating time by reducing battery consumption, *e.g.*, *id.* at Attach.BB-23, p.1. Topcon developed and patented these capabilities because Subject Laser Levels are designed for surveying applications.

> iv.    Purchasers of Subject Laser Levels expect to use them for surveying in the field

"Over the past 50 years, advances in technology have increased the efficiency of the surveying profession." *Id.* at Attach.AU, p.20. Laser levels, including Subject Laser Levels, are one such technological advancement.  *See* Section II, *supra*; Gilbertson Depo., p.55 (describing reduction in contractors' reliance on surveyors "to come out and pound survey stakes in the ground to show grade to the equipment operator.")  At the Time of Entry, laser levels were a well-established surveying tool, especially in construction surveying. The 1989 textbook *Laser Surveying*, aimed at "engineering surveyors" and "civil engineers," states that "lasers were first introduced into engineering surveying" in the 1960s and by "the early 1980s" "99% of commercial contractors in the USA used lasers at some time in their work." R56.3 Statement at

Attach.AL, p.2-3, 31. Machine control was first developed in the late 1990s and was in wide use when Subject Laser Levels entered the United States. *Id.* at ¶66.

Given laser levels' established surveying applications at the Time of Entry and their ability to improve efficiency in performing the same functions as automatic and digital levels, purchasers of Subject Laser Levels expect to use such products outdoors to measure elevation relative to the earth's surface. The most common context is "construction surveying {which} is often associated with speed of operation." *Id.* at Attach.T, p.564.  Thus, Topcon's distributors identified Subject Laser Levels' main customers as "contractors, surveyors, engineering firms, educational if they're teaching some of these technologies in school, research, and then governmental." Gilbertson Depo., p.25; *see also id.*, p.19-20, 27, 48, 50 (clarifying the product categories being discussed and noting "{t}he {RL-VH model rotating laser} is a different contractor" whereas "rotating lasers and the pipe lasers are generally in dirt applications"); Cleary Depo., p.22 ("So, our customers are mostly construction contractors but there is a bunch -- there is a bunch of surveyors still."). Notably, within the construction industry, contractors have increasingly absorbed the activities conducted by surveying professionals. *See* R56.3 Statement at ¶80. As explained above, *see* Section V.D.ii.b, *supra*, because the term "surveying" is not defined by reference to professional licensure, the measurements undertaken by Subject Laser Levels constitute "surveying," regardless of whether the individual holds a PLS license. *See* R56.3 Statement at ¶81.

The instruments' internal workings and compensators are highly complex. *See id.* at ¶83. As such, when recalibration is required, the task is performed by "factory trained and certified technicians," which include land surveyors. *Id.* at ¶85. Thus, purchasers expect ongoing technical

support when using Subject Laser Levels, just as they may need to seek expert support to recalibrate or repair a damaged compensator in an automatic level. *See id.* at ¶85(a).

Distributors testified that purchasers of Subject Laser Levels generally approach a distributor already knowing what type of product they're going to need or else interact with a distributor at the purchaser's worksite. *Id.* at ¶86. These are sophisticated professional purchases, "not something that we're going to find at Home Depot or Lowe's through the aisles when you're walking the stores." Kerwin Depo., p.225. Rather, at the Time of Entry, Subject Laser Levels competed for sales within the surveying market against products with comparable specifications produced by, *e.g.*, Trimble, Leica, and Hilti. *See* R56.3 Statement at ¶87; Attach.BM. One model at issue, the PZL-1A, lacked commercial competitors at the Time of Entry because the Topcon product was (and is) more advanced than those offered by other manufacturers. *Id.* at ¶87(a). However, while a purchaser might select Subject Laser Levels, automatic levels, or digital levels to perform the same leveling task, *see id.* at ¶42, Subject Laser Levels do not compete with and could not be replaced by the interior alignment laser levels analyzed by the Court in *Agatec* or by CBP in prior administrative classifications. *See* HQ H014565 (Mar. 21, 2008); HQ N018805 (Nov. 16, 2007), discussed *supra*.

> v.   It is not economical to use Subject Laser Levels for less sophisticated applications

At the Time of Entry, Subject Laser Levels were priced to match their specialized capabilities and 10-to-15-year functional lifespan:



Because the foregoing prices are from Topcon to its distributors, end users would pay *higher*

prices that reflect distributor markups. Given the investment required, for example, "purchasing

a single slope or dual slope laser, the primary use for that is to put in a percent grade for it for the

dollars that you're spending for that product." Kerwin Depo., p.137. No rational purchaser—

much less a construction firm on a tight budget—would purchase a $1,000 rotating laser (or a

$10,000+ PZL) merely to perform an alignment task that an inexpensive air bubble level could

accomplish. *See* R56.3 Statement at ¶76. (Heading 90.15 EN excluding air bubble levels).

Indeed, Subject Laser Levels are generally more expensive than the automatic levels traditionally

used for differential leveling applications. *See id.* at ¶76; Gilbertson Depo., p.39-40.  It is not

economically practical to purchase Subject Laser Levels merely for small-scale interior

alignment (*i.e.,* non-surveying) work.

      vi.   The channels of trade and environment in which Topcon's surveying
           instruments are sold indicate that they are surveying instruments

     Topcon sells Subject Laser Levels through specialized distributors who, in turn, sell

Topcon's products to end users. R56.3 Statement at ¶74.[14]  Consistent with the actual use

---

[14] Representatives of three such distributors were deposed during this litigation: James Cleary of
Cleary Machinery, Adam Gilbertson of RDO Equipment, and Scott Beathard of Inteq
Distributors.

described in Section V.D.2.i, *supra*, these distributors describe their customer base as follows:

- "Construction Supply and Survey Houses throughout North America." R56.3 Statement at Attach.BN, p.15 (Inteq Distributors);

- "Construction, Survey, Agricultural, Landfill, Mining, Aggregate, and Industrial markets." *Id.* at Attach.BN, p.18 (GeoShack);

- "Construction and surveying." *Id.* at Attach.BN, p.23 (Cleary Machinery); and

- "Engineers, surveyors, and machine operators." *Id.* at Attach.BN, p.26 (RDO Equipment).

Moreover, the websites of these distributors, other distributors, and Topcon itself all characterize Subject Laser Levels as surveying instruments. *Id.* at ¶77(d).  To illustrate:

- Tiger Supplies advertises "Surveying Equipment" and "Construction Lasers" for sale and include certain Subject Laser Levels as "best sellers." *Id.* at Attach.BN, p.22;

- Contractors-Tools advertises various Topcon rotating laser levels under "Survey Tools." *Id.* at Attach.BN, p.28-31;

- Survey Supply Inc. advertises various Topcon rotating and pipe laser levels under "Survey Equipment." *Id.* at Attach.BN, p.32-33; and

- Other surveying specialty stores, including "Capital Surveying Supplies," "The Surveying Equipment Store," "Survey Instrument Sales," and "International Surveying Equipment," offer Topcon rotating and pipe laser levels for sale. *Id.* at Attach.BN, p.34-38.

During depositions, Topcon distributors also described attending trade shows for surveyors and large contractors.  R56.3 Statement at ¶78. Topcon's distributors as well as Topcon itself also advertise Subject Laser Levels in industry publications, *e.g.*, professional land surveying and machine control magazines. In the examples below, Topcon's rotating laser levels are advertised alongside automatic levels and total stations or otherwise for use in field applications. *Id.*

NONCONFIDENTIAL VERSION



The American Surveyor 2011 Vol. 8 No. 3

Source: *Id.* at Attach.BN, p.44.



Source: *Id.* at Attach.BE.

Thus, Subject Laser Levels are marketed directly to surveying and civil engineering professionals and are sold through specialized surveying instrument distributors. At the Time of Entry, Subject Laser Levels were not available "at Home Depot or Lowe's," where bubble levels and other levels (laser or not) used primarily in interior alignment applications are marketed. Kerwin Depo., p.225. As described in Section V.D.2.iv, *supra*, Topcon's distributors often market to purchasers directly on their worksite. The distributors also provide aftermarket training in cutting-edge Topcon products (such as the PZL-1A) as well as product support and service. R56.3 Statement at ¶84. In addition, Topcon itself makes professional education modules and instructor-led courses available to purchasers of Subject Laser Levels, covering subjects like "machine control," "earthmoving solutions," "building construction," "measurements with a level," as well as product-specific training videos for rotating and pipe lasers. *Id.* at Attach.BO.

Finally, it is noteworthy that all Subject Laser Levels come standard with a level sensor (for rotating laser levels) or remote control (for pipe laser levels). These accessories allow the Subject Laser Levels to be used over long distances spanning (at minimum) multiple football fields, and demonstrate that the intent at time of purchase is to dedicate these products to measuring elevation over long distances, *i.e.*, outside and thus relative to the earth's surface.

> vii. The *Carborundum* factors establish that Subject Laser Levels are "commercially fungible" with products that are primarily used for surveying, *i.e.*, measuring elevation relative to the earth's surface

The class or kind of merchandise that is commercially fungible with subject laser levels is principally used for surveying, as confirmed by each *Carborundum* factor. Their primary use is to measure elevation relative to the surface of the earth, including through differential leveling (rotating lasers), machine control (rotating lasers), grade control (rotating & pipe lasers), and pipelaying (pipe lasers). Compared to the automatic and digital levels with which they compete,

Subject Laser Levels offer far greater efficiency and additional machine control capabilities (rotating lasers) in performing these tasks. Given the outdoor, in-the-dirt applications, surveying levels are designed to measure elevation over long distances for long periods of time, withstand dust and water, and sit atop a tripod. Indeed, Topcon has patented several such design elements of its Subject Laser Levels.

Surveying levels, including Subject Laser Levels, are purchased by persons intending to take outdoor measurements in a professional (*e.g.*, construction) setting. Given the sophisticated optical elements and compensators housed in these levels, purchasers rely on certified technicians for interim service over the instrument's lifespan, which is 10-15 years in the case of Subject Laser Levels. Subject Laser Levels are priced at a premium, even more than automatic levels. It would not be economical to devote surveying levels to less demanding applications. As such, Topcon's network of distributors markets and sells Subject Laser Levels alongside automatic and digital levels to professional surveyors and large contractors to meet the demands of large-scale construction and earthwork. Their principal use is therefore surveying within the meaning of Heading 9015, HTSUS.

### E. CBP Misclassified the Subject Laser Levels Based upon this Court's Ruling in *Agatec*, which is Inapplicable Because it Involved a Different Type of Product and Otherwise Misconstrued the Framework for Defining "Surveying"

As demonstrated above, the Subject Laser Levels are properly classifiable as surveying instruments under Heading 9015, HTSUS. Yet, CBP classified the Subject Laser Levels under Heading 9031, HTSUS. HQ H218087 (June 18, 2014). CBP's classification relied exclusively upon a misapplication of this Court's ruling in *Agatec*, erroneously believing that the Subject Laser Levels were similar to the interior alignment lasers at issue in *Agatec*. The CBP Port Director stated that "{t}he Port believes it is bound by the definition of surveying as applied in the *Agatec* case," GOV 0001067-69 (Apr. 24, 2012), and CBP's ruling explained that it was "not

at liberty to second guess the court's analysis," HQ H218087 (June 18, 2014), despite open acknowledgment that "{***Topcon* really ha{*s} a point here**}" and that the Court "may have been wrong," GOV0000105 (July 26, 2012); GOV0001063 (July 26, 2012) (emphasis supplied). However, CBP's fundamental mistake was its failure to recognize that the Subject Laser Levels are not the same class or kind of product as the ones the court analyzed in *Agatec*.  *See* R56.3 Statement at ¶22.

The Subject Laser Levels are surveying instruments used in construction projects in the field, while the *Agatec* levels were basic alignment levels used primarily for interior (non-surveying) projects (**Section E.1**).  Moreover, while the dictionary definitions cited in *Agatec* are consistent with those relied upon by Plaintiffs, *Agatec*'s reliance on an affidavit summarily narrowed the common and commercial meaning of "surveying" established by those definitions and otherwise was inapposite and contravened other judicial interpretations of Heading 9015, HTSUS (**Section E.2**) and the evidence before this Court. The Court should reject CBP's incorrect application of *Agatec* and its resulting Ruling.

> 1.    Agatec *does not apply because Subject Laser Levels are high-tech levels used by surveyors in the field while the* Agatec *levels were basic levels used primarily for carpentry and interior projects*

In *Agatec*, the court considered rotary laser level model numbers A410S and GAT120. *Agatec*, 31 C.I.T. at 847. These both had a maximum operational range of 1,000 feet (roughly 300m), could only be used in one dimension (not angles), were "incapable of spatial measurement," and were primarily "used in construction projects for houses or small buildings, as well as landscaping for such structures." *Id.* at 847-48, 853. Agatec's marketing materials describe the GAT120 as "ideal for contractors who work primarily in horizontal, but have occasional use for vertical alignment at *short distances*." *Id.* at 848 (emphasis supplied). Similarly, the A410S was described in Agatec's marketing materials as "used for leveling,

NONCONFIDENTIAL VERSION

vertical alignment, plumbing, and squaring" with applications including "installing suspended ceilings, technical flooring, partitions and a variety of outdoor alignment work." *Id.* Critically, the Court recognized that "{n}otwithstanding its occasional outdoor applications, the A410S product was 'designed with the *interior* contractor in mind' and is used for 'installing and aligning tilt-up walls, partitions and windows and door frames' as well as 'squaring walls, decks, and foundations,'" *i.e.*, applications that "are not principally measuring positions relative to the earth's surface." *Id.* at 848, 854 (emphasis supplied). Moreover, both products were excluded from the "Construction/Surveying Equipment" section of Agatec's product catalogue. *Id.* at 854 n.3. The Court found "sporadic mentions of direct measurement of the earth's surface" not to indicate the articles' "principle use," *id.* at 854, noting, in sum:

> Nowhere in the instruction manuals and the product catalogues is it suggested that the laser levels are used to measure the surface of the earth or determine the relative position of points to the earth's surface. Even the president's affidavit, which is the only evidence Agatec has produced referring to the measuring capabilities of the laser levels, stops short of describing such use as the principal use.

*Id.*

The differences with Subject Laser Levels are manifest.  First, *Agatec* did not analyze the classification of *any* pipe laser, *see generally id.*, a fundamental distinction that CBP overlooked in preparing its classification ruling here, *see* HQ H218087 (June 18, 2014). Pipelines are not laid indoors and thus ensuring properly graded pipes in a trench necessarily requires the measurement of positions and grade relative to the earth's surface. Likely for this reason, the Heading 90.13 ENs, which *Agatec* had no occasion to consider, specifically provide that "instruments for leveling (aligning) pipes by means of a laser beam" belong under Heading 9015.

Similarly, *Agatec* did not analyze the classification of *any* positioning zone laser. CBP likewise overlooked this distinction.  *See* HQ H218087 (June 18, 2014). Topcon's PZL-1A is

exclusively dedicated to outdoor use in machine control applications. It "transmits a revolutionary Lazer Zone® signal that creates a measuring area 10 meters (33 feet) in height!" R56.3 Statement at Attach.AX, p.2, and functions over a 2,000ft (600m) range, *id.* at ¶33(a). It features IPX6 water resistance rating and is used on tripod mount. *Id.* at ¶26. Topcon was the first to integrate this technology with GPS in 2005. *Id.* at ¶64(b). Thus, the PZL is in an entirely different class from the *Agatec* products.

The rotating laser levels under consideration in this action also bear little resemblance to the Agatec products previously considered by the Court. Because the maximum range of most models goes from nearly 2,000ft (600m) to over 2,500ft (800m), *Id.* at ¶35,[15] they are most often used to bring large tracts to grade (*e.g.*, airports, shopping centers, parking lots, or highways), *id.* at ¶61. Receivers used to aid in measurement over a long distance are a standard accessory included with *all* of the subject Topcon products, *id.* at ¶92(a), something that was never established with respect to the *Agatec* devices. *See* 31 C.I.T. at 847-48, 853 (stating only that "The levels *may* work in tandem with a receiver…" and that absent such receiver the Agatec products were "incapable" of spatial measurement) (emphasis supplied). Unlike the Agatec products, Topcon's rotating laser levels are ruggedized for field conditions with IP-66, IP-56, or IP-54 water- and dust-resistance ratings. *Id.* at ¶26. They are almost exclusively depicted in use outdoors in both Topcon and distributor marketing materials, *id.* at ¶77(d); Attach.BN, and are expressly characterized as "surveying" or "grade"-setting equipment in both marketing materials and relevant patents, *id.* at ¶79; Attach.BB. They are regularly used to control the position of large earthmoving machines to eliminate "stake and restake" requirements on cut-and-fill

---

[15] The RL-VH4 models and RL-H3D TAURUS have a maximum range of nearly 1,000ft (300m). R56.3 Statement at ¶33.

operations. *Id.* at ¶¶60, 63, 65. Slope laser level models are capable of measuring in two

dimensions. *Id.* at ¶¶38(a), 58(a). And while *Agatec* omitted to discuss the accuracy of the

products at issue, the accuracy of Topcon's rotating laser levels compares favorably to that of

automatic levels, which are undisputedly surveying equipment. *Id.* at ¶¶37, 38(d), 50(c), 45(a).

Given these differences, Topcon does not consider any Agatec product to compete with Subject

Laser Levels. *Id.* at ¶¶87. In short, the "principal use" of the rotating laser levels under

consideration here bears little resemblance to the indoor applications of the Agatec products.

CBP was wrong to conflate the two.

> 2.    *Agatec misconstrued and narrowed the dictionary definitions that it considered,
>       in contravention of Federal Circuit interpretive standards and prior
>       interpretations of Heading 9015, HTSUS*

Accepting the definitions on which *Agatec* relied for the sake of argument, *see* Section

IV.D.1.i (use of dated definitions contravenes Federal Circuit framework), the Court nonetheless

erred by relying on a source that was less than "definite, uniform, and general throughout the

trade," *Len-Ron*, 334 F.3d at 1310, to narrow their scope. Specifically, the Court's description of

the products at issue concluded with a lengthy summary of a single, uncorroborated affiant's

opinion regarding the difference between "higher order" and "lower order" surveying. *Agatec*, 31

C.I.T. at 848.  Despite the affiant conceding that the products were "surveying" products ("of

lower order surveying") and the absence of any carve-outs based on surveying "orders" in the

dictionary definitions, *Agatec* appeared to rely on this affidavit to introduce a line between

surveying covered by Heading 9015, and surveying excluded from Heading 9015. *See id.* at 848.

*Agatec* cited no other evidence describing different "orders" of surveying, nor is there any

demarcation of surveying "orders" found in Heading 9015, the Heading 90.15 ENs, or dictionary

definitions of "surveying."  In short, the affidavit referenced in *Agatec* appears to have

unilaterally redefined and narrowed the common meaning of "surveying" to "higher order" surveying.

Here, expert reports and testimony contradict the propositions upon which *Agatec* relied. *See* Oberlander Expert Report, p.3-9 (establishing that, *e.g.*, surveying can be performed in one dimension and such measuring activity comprises surveying even when of a lower order, because "orders" merely refer to the degree of accuracy and different circumstances have different requirements in that respect). *Agatec* was incorrect to treat a single affidavit as capable of narrowing the common meaning of "surveying," because *Agatec* never established that the affiant's characterization of "surveying" satisfied the high bar requiring that "{o}ne who argues that a term in the tariff laws should not be given its common or dictionary meaning must prove that there is a different commercial meaning in existence which is definite, uniform, and general throughout the trade." *Len-Ron*, 334 F.3d at 1310 (quoting *Rohm & Haas*, 727 F.2d at 1097). Therefore, this Court should not rely on *Agatec* to narrow the common meaning of "surveying."

F.    **The Remaining Articles Are "Accessories" Within the Meaning of the HTSUS**

As demonstrated above, Subject Laser Levels are properly classifiable as surveying instruments under Heading 9015.  Thus, Subject Laser Levels' accessories are likewise properly classified under Heading 9015.  The specific accessories subject to this action can be categorized as follows:

1.    Field Controller: This is used to remotely control Topcon's PZLs and collect and display data gathered through surveying exercises. R56.3 Statement at ¶88.

2.    Alignment Targets: These are used to align and lock the laser beam emitted by various models of Subject Laser Levels. *Id.* at ¶89.

3.  Holders: These hold either level sensors or alignment targets in place. The holders for level sensors are designed to affix to a surveyor's rod or leveling pole. *Id.* at ¶90.

4.  Stands and Legs: These attach to pipe lasers to provide height, support, and stability. *Id.* at ¶91.

5.  Sensors: These are electronic devices used to facilitate machine control and/or measure the elevation or grade with a rotating laser level. They are generally used on surveyor's rods. *Id.* at ¶92.

6.  Battery Holders: These hold rechargeable batteries needed to power certain models of rotating laser. *Id.* at ¶93.

These categories of products are properly considered accessories, as each "bear{s} a direct relationship to the {Subject Laser Levels} that it accessorizes." *Processed Plastics Co. v. United States*, 473 F.3d 1164, 1172 (Fed. Cir. 2006). Each of these items is designed solely for use with certain models of Topcon's rotating and pipe lasers, including Subject Laser Levels. Field controllers remotely control subject PZLs and collect data for display. Alignment targets align and lock the laser beam emitted by the TP-L4 and RL-VH4 series of Subject Laser Levels. Holders affix sensors and alignment targets in place to facilitate their use with Subject Laser Levels. Stands and legs attach to pipe lasers (or to trivet stands that are, in turn, attached to pipe lasers) to provide height, support, and stability when in use. Laser sensors enable measurements to be taken with Subject Rotating Laser levels and are designed to communicate with those products. Finally, the battery holders are designed to fix rechargeable batteries in place in order to power the associated model of rotating laser level. As accessories to the Subject Laser Levels,

these articles must be classified under subheading 9015.90.0030, which covers accessories of surveying levels.

## VI. Conclusion

In accordance with GRI 1, Subject Laser Levels are surveying instruments classifiable in Heading 9015. Thus, Subject Laser Levels are properly classified under Heading 9015.30.4000 and their accessories are properly classified under 9015.90.0030. Plaintiff respectfully urges the court to enter summary judgment in Plaintiff's favor, ordering that the Subject Laser Levels and their accessories be reclassified accordingly, and reliquidated at the lower rate of duty.

/s/ Myles S. Getlan

Myles S. Getlan
Jonathan M. Zielinski
James E. Ransdell
CASSIDY LEVY KENT (USA) LLP

Angela M. Santos
Leah N. Scarpelli
ARENTFOX SCHIFF LLP

*Counsel for Topcon Positioning Systems, Inc.*

November 3, 2025

NONCONFIDENTIAL VERSION

### Certificate of Compliance with Chambers Procedures 2(B)(1)

The undersigned hereby certifies that the foregoing brief contains 13,961 words, exclusive of the caption block, table of contents, table of authorities, signature block, braces, and certificates of counsel, and therefore complies with the maximum 14,000 word count limitation set forth in the Standard Chambers Procedures of the U.S. Court of International Trade.


By:    /s/ Myles S. Getlan
         Myles S. Getlan